FARMER v. SHINSEKI FARMER v. SHINSEKI May it please the Court, Kenneth Carpenter appearing on behalf of Mr. Terry Farmer. The issue in this case, Your Honor, deals with whether or not the Veterans Court relied upon a misinterpretation of 38 CFR 3.304F3. The Veterans Court mistakenly concluded that remand was not required so that the Board could assess and apply this new rule. On the grounds that the appellant had not adequately pled or demonstrated prejudicial error. How do you deal with the fact that, I mean, how do you respond to the general principle that when you have a general statute of regulation and then you have a very specific one, that the specific one would control? I mean, F5 very specifically applies to the soldier-to-soldier assault, correct? Well, it applies to personal assault, that's correct, Your Honor. It does not necessarily specify soldier-to-soldier assault. We would suggest that F5 can easily be read as the more specific because it does specifically refer to a fear of a hostile military activity. And that that is more specific than the general proposition of a personal assault which could be as a result of victimization by any individual. I think you got it backwards. You're arguing that F3 is more specific than F5? That F5 can be interpreted as being more specific. Because there's no hostile requirement in there. In F5, that's correct. So how do you interpret the word hostile in F3? Well, hostile is defined by the regulation in terms of fear, whether that hostile military action does or does not produce fear. I don't understand what you're saying. I mean, in the CAVC case, they addressed this question and looked to another part of the regulations for the definition of hostile. So are they wrong in doing that? Yes.  Well, I think hostile needs to be interpreted in terms of the definition that has been provided by the VA in its own interpretation of the meaning of that phrase as used in the regulation. And in the regulation, it gives several specific examples. However, in the published interpretation of that regulation, the VA explains that if a veteran... I have the Federal Register. From which page? I don't seem to have the specific page in my notes. It was indicated... What's the heading under which it appears? Fear of hostile military or terrorist activity? Yes. And what's the quote? It says, therefore, if a veteran experienced, witnessed, or was confronted with an event involving an actual or threatened death or serious injury or the threat to the physical integrity of civilians, then the event would qualify as a stressor. It seems to me that what hostile military activity is referring to is the specific type of stressor that is covered by this regulation. The regulation also indicates that in order to qualify, there has to be an event or circumstance within the meaning of this rule. The interpretation also indicates that by using or modifying the phrase, such as, after the list of examples, the VA intended to present a list of examples to illustrate what qualifies as an event or circumstance and not as a defining restriction. So explain to me how you... So you're saying that if you have a personal physical assault, which clearly falls within F-5, you're saying if there's somehow a fear connected with that personal physical assault? No, Your Honor. Whether or not that personal assault is a result of a hostile military activity. In other words, it is part of an event or circumstance that is produced by a military action. You're saying that any action by a military individual is hostile action, right? Yes. Well, that seems to be a tough argument. You're sort of reading the word hostile out of the regulation. Well, I don't think so, Your Honor, because I am relying upon the way in which the VA itself connects the phrase or characterization of hostile military or terroristic activity to define the type of stressor that qualifies under this regulation. Okay, so you have two soldiers in a bar, and one punches the other one. That's a hostile military activity within the meaning of F-3? Because if it's a military person who does it, then I guess a punch can be considered hostile in a general sense. In the context of 3, it is based upon the fear that is produced as a result of that event or circumstance. Okay, so it is covered. Judge O'Malley's example is covered. Only if the veteran asserts that level of fear. What level of fear? The level of fear that is described in the regulation. Which is what? Which is that it produces a sense of actual threat of injury to the individual, whether they perceive... So it sounds as though you're saying that just a fight over who's going to pay for the beer is covered by this regulation, right? Well, I think in that extreme example, I would have to accept that under the definition, as I read the interpretation by the VA, that yes, such a circumstance would be covered. However, in this case, what we're talking about is the representation by the veteran that a superior individual within the military hierarchy attacked him and abused him in a way in which it produced the type of fear that is described in this regulation. And therefore, he should be entitled to the benefit of the consideration by the board under 7104 of this applicable provision of law. This provision of law... Don't you think their argument is trivializing this regulation? Doesn't that require that there be a presence of some hostile force? No, Your Honor, it does not. In the text of the regulation as written, they limit the list of examples to that type of circumstance. But as I read to you from the interpretation that the VA itself made, they interpret this as being far more broad than that type of situation. Certainly, it is intended in the main to cover those types of circumstances and not allow those types of circumstances to not be considered. But that does not mean, as the VA has clearly indicated in its interpretation, that there are other circumstances so long as it produces the requisite level of fear on the part of the individual and that fear is the triggering circumstance for the determination as to whether or not a particular event or circumstance applies because we're dealing here with one type of VA disability, and that is post-traumatic stress disorder. If the bar fight would have resulted in a broken arm, there would be no question that that bar fight would be considered as a basis for the compensation for the injury if there's any resulting disability from the broken arm. With post-traumatic stress disorder, up until the promulgation of F-5, there needed to be creditable supporting evidence that that bar fight actually happened. And if the bar fight did not result in a broken arm, but simply resulted in a fear that later developed a psychiatric disability, then that psychiatric disability could not be compensated for unless there was creditable evidence supporting the fact that that incident took place. In this incident, excuse me, in this circumstance, Mr. Farmer is saying that he was attacked by his drill sergeant and that that attack resulted in the type of requisite fear that is required by this regulation. We're pretty much writing F-5 out of the inquiry at this point then because all someone has to say is, I was attacked by my drill sergeant or, for instance, a female could say that there was a sexual assault by someone else in my unit and I feared that that would happen again. So, by definition, they fall out of F-5. They don't have to prove that it actually happened. All they have to say is that they feared it. In order to get an examination by a VA psychiatrist or psychologist, and if the VA psychologist or psychologist does not confirm that that reported stressor supports the diagnosis, then there's no basis for the award. All that you get under F-5 that you don't get under, excuse me, under F-3, I apologize. All you get under F-3 that you do not get under F-5 is that right to the examination. The examination under F-5 is discretionary. It says that an examination may be obtained. An examination is required by the provisions of 3. I see that I'm into my rebuttal time. Thank you, Mr. Carpenter. I'll save your rebuttal time. Mr. Goodman? Good morning, Your Honor. May it please the Court, even before we get to the merits here, our intention is that the Court has no jurisdiction because Well, you always make that argument once you get to the merits. That's true, Your Honor. In this case, it's particularly apt and I'd like to come back to it. Well, moving to the merits directly, the Veterans Court got it right in APTAVITA and I'd like to just quote a small portion of that decision on page 291 of the Court's decision. The Court said, The Court finds it significant that the examples provided all involve actions originating from individuals who commit hostile military or terrorist acts toward the United States military, not nefarious or even criminal acts of one service member directed at another service member. We think that Court got it right. And that's confirmed by the final rule that the VA issued. The final rule, and this is at the heading, Your Honor, Coverage of Other Stressors. The VA was dealing with comments from a proposed rule addressing sexual abuse and, quote, abuse by military personnel of subordinate military personnel. And the VA clearly said those comments are outside the scope of this rule. The VA at no point saw this rule as addressing personal assault from one service member to another, including to a subordinate military personnel. What F-5 is about, as the current delineation is, is those personal assaults. And F-3, the whole idea here was to realize that in the current environment, that combat isn't the only major source of PTSD, but also being in a combat-like situation, the VA described it, where you're faced with IEDs and possible terrorists. And the VA made clear it wasn't just foreign enemies. It can be homegrown. It can be domestic terrorists. But that doesn't mean that it, therefore, the rule assumes F-5, such that all personal assaults from one service member to another are included. What does hostile mean? Does it mean anti-American? Yes, Your Honor. It's talking about an enemy against the United States, not just an enemy, one person against another. Why wasn't it defined that way for purposes of this regulation when there was a similar definition in another regulation? Well, they didn't specifically define what hostile military or terrorist means either. But in context, it's clear that hostile military or terrorist activity doesn't refer to personal assaults. It's, as the Veterans Court described it, it's the anti-American... Well, it could refer to a personal assault if it occurred by a terrorist, if it happened by a homegrown terrorist, right? I'm sorry, what's the question, Your Honor? I mean, you said it doesn't refer to personal assaults. What you're saying is it doesn't refer to soldier-to-soldier personal assaults. Yes, Your Honor. It could apply to something like the incident at Fort Hood. Yes, Your Honor. Soldiers against soldiers. It was. Under the terms of this, that would be described as terrorism, and domestic terrorism, and that would be included in the definition. There's nothing about this definition, and that's clear in the final rule. It limits it to a foreign combatant, but it is a combatant. It's not just another soldier who has a problem with you or commits a sexual assault against a single soldier. It's more of a general anti-American stance. It's somebody who's... Well, the Fort Hood thing didn't necessarily have an anti-American stance, even though it was terrorist. I mean, there are terrorist activities, which presumably would be covered by this, which aren't necessarily anti-American. I suppose that's possible, Your Honor, and the exact contours of what we mean by terrorist in this regulation aren't established, and the court need not decide those limits here. Well, they're not arguing that here, right? But he's not saying, as I understand the argument, Mr. Farmer's not saying that this is a terrorist activity. In fact, it's important to bring it back to the jurisdictional question that he never even told the Veterans Court whether he thought it was hostile military or whether he thought it was hostile terrorist. In fact, he didn't tell the Veterans Court anything. In his reply brief, he concedes, and I'm quoting in page 2 of his reply brief, Mr. Farmer concedes that counsel below did not provide any factual or legal analysis to support this theory, other than the court, of course, and the regulation. Based on that, his failure to provide any factual or legal analysis, the Veterans Court said that it was an insufficiently pled, underdeveloped argument that the court need not consider. I apologize for not citing this case to the court in my brief, but I'd like to bring the court's attention to Carbino v. West at 168 F. 3rd. 32, where this court dealt with a similar situation where a veteran had raised an argument for the first time in the reply brief, and the Veterans Court refused to consider the argument. And this court said that it was appropriate that the Veterans Court apply its own rules and have the authority to say when an argument's been sufficiently raised. And this, we contend, is a valid jurisdictional argument. Yes, Your Honor. Okay. Yes, Your Honor. In the case of Edo, there's this reference to this other regulation, 3.1Y5. Yes, Your Honor. What is that regulation about? That's simply a definition of the very hostile force. For what purpose? I don't recall offhand, Your Honor. I think that the general definition's widely applicable. I can go back and research that. I apologize, Your Honor. I don't remember whether it was limited to certain regulations or whether it explicitly applies here. The phrase there being defined, though, was hostile force, not just hostile. Our argument's not that the word hostile is necessarily the problem, because there's no doubt that a kick in the head is hostile. The problem is it's not hostile military or hostile terrorist activity. So it's not military activity, just because somebody – Can I help you out? 3.1Y5 defines hostile force as an entity whose actions are taken to further or enhance anti-American military, political, or economic objectives or views. Yes, Your Honor. Okay. That's what 3.1Y5 applies to. That's the definition of hostile force, yes. The question is what's the context of it. Right. And I apologize, that question I don't know, Your Honor. But the problem here is not the word hostile. It's hostile military and hostile terrorist. And what we're – Well, what does military mean? Right. In context of this rule, it's clear that military doesn't mean somebody's just a member of the military. It means it's a military action. It's like combat. It's important to note that the basis for all these regulations is 38 U.S.C. 1154B. So if in a training exercise one soldier shoots another, that would be covered? If that were the Fort Hood type situation, it could be. No, I didn't say Fort Hood. Just an ordinary training exercise. One soldier shoots another. Is that hostile military activity? I could conceive of the situation where it might be. If it's based on jealousy or something personal, no. That would be a personal assault. But if it was during an exercise as part of military training, it could be. Yes. Even if it's just an accident? An accident probably would not be covered, no, because that's not hostile military activity. That's friendly. I've got to tell you, I don't think the VA has done a very good job of defining the parameters of this regulation. And you take that comment for what it's worth, but I just don't think that the VA has done what it should do here. While additional verification would certainly be beneficial, in the final rule they did make clear that abuse by military personnel, subordinate military personnel, is outside of this rule. So they did make clear that their interpretation is that that kind of thing is not considered here. And there's no question that what Mr. Farmer is alleging here is exactly that. Well, I mean, suppose it happened during the training exercise, example, and it was a superior shot and a sergeant shot a private. I mean, is that covered or not? It's certainly not exempt because it's a superior officer against an inferior. No, Your Honor, and that would be a fact-specific question, exactly the kind of fact-specific question that would need to be addressed below. And here, again, back to the jurisdictional argument, he didn't give any color to his claim, such that the Veterans Court felt that it was sufficient to address. And, of course, that's a fact finding by the Veterans Court. And on that basis, the regulation here, and that's part of the problem we're dealing with, is we're not faced with a full interpretation of the regulation by the Veterans Court because the Veterans Court didn't interpret the regulation, explicitly didn't interpret the regulation. The Veterans Court interpreted it in at the veto, and both parties are relying on at the veto for that interpretation because the Veterans Court didn't touch it in this case. Are there other cases like this pending? Yes, Your Honor. In fact, there was a related case before this Court last month, and it was cited by both parties as a related case. And what happened in that case? There's no... Was it an argued case? Yes, it was an argued case, Your Honor. And my understanding is there are other cases where F-3 is cited as... and the analysis will certainly be decided by this Court sooner rather than later. But this Court, this case, we contend, is not the appropriate vehicle for it because the Veterans Court didn't consider F-3, didn't interpret F-3, and instead refused to consider F-3 explicitly. So we don't think this is the right vehicle to make that assessment of what this regulation means and where the contours are. Before there's no further questions, we respectfully request that the Court affirm the conclusion of this Court. Thank you, Mr. Goodman. Mr. Carpenter, you've got a little over four minutes, Your Honor. Thank you, Your Honor. Mr. Carpenter, I take it from your brief that your other case is about a sexual assault. It is. Your brief falls into that language, and it seems to forget that that's not what the issue here. That's correct. Okay. Except that it is in relationship to what is the meaning of the regulation in terms of whether or not this regulation needed to have been considered under 7104 by the Court. Right, really. It's the same brief. You just used the brief and just changed the name, right? Pretty much. No, Your Honor, because this case really comes at it from an entirely different perspective than the case in Hall. Hall was whether or not 5 excluded the consideration of 3, and 5 was the only regulation that could be considered. What's the issue in Hall? That's what I was just describing, that it's a sexual assault, and the argument there is whether or not 5 precludes consideration of 3. No, it's a sexual assault that's not covered by 5. It's not covered by 5, that's correct, Your Honor. In this case, we have a situation that does involve a personal assault, but not a sexual assault, and one that has a much clearer hostile military aspect to it. The other consideration in this case is that when the VA wrote its regulation, it used the disjunctive or rather than the conjunctive and. It didn't say hostile military and terroristic activity. It framed it in the alternative, and therefore it is critical to understand what the meaning is, and in my view, the only way we can derive the meaning from this is by looking at the interpretation that was offered in their published interpretation of what they intended to be covered by this regulation. I think another question. Why shouldn't we interpret hostile military to mean hostile to the military? In other words, the hostility has a military focus as opposed to a personal focus. John doesn't like Jim. To the extent that it involves hostile military persons, yes. In other words, whether the activity that is generated is in the context of a military activity. In this case, it was the relationship between the trainee and the drill sergeant that was the hostile military activity that resulted in the psychiatric injury that took place in this case. Why isn't it more reasonable to interpret hostile military as, for example, when the Iraqi invasion occurred, they were fighting the military establishment of Iraq. When it evolved into an insurgency with Al-Qaeda and all the others, that was terroristic. Well, because... Not our own people. Absolutely not. And these are not mutually exclusive definitions, and that's why... So you're putting American soldiers in with the Iraqi army? Is that the point? Well, actually the point that we're trying to make is that when a military personnel injures another person in the military, and there are psychological consequences that produce both fear and result in a post-service disability from post-traumatic stress disorder, that should be compensable and should be considered under the provisions of F-3. Which is not to say that F-5 should not be considered in the first instance, but F-5 is a higher evidentiary requirement because there is still the need to produce some corroborative evidence. In the context of F-5, this is a much lower evidentiary threshold because it's based simply upon the reported stressor and whether the reported stressor fits within the definition that is provided under F-3. If it is within that definition, then the regulation mandates that there must be an examination by a VA psychiatrist or psychologist in order to confirm whether the diagnosis made does or does not support the reported stressor. Thank you, Mr. Clark. Thank you very much. The case is submitted. We thank both counsel. And that concludes our session for today. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.